**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

**UNITED STATES OF AMERICA**

**Plaintiff**

**v.**

**JOSE ANTONIO GARCIA-ORTIZ
a/k/a "Tuti"**

**Defendant**

**CIVIL NO. 01-111(DRD)**

# OPINION AND ORDER

Table of Contents


I. Procedural Background . . . . . . . . . . 1
II. Factual Background . . . . . . . . . . 2
III. Applicable Legal Standards . . . . . . . . . . 9
IV. Analysis
- The Grand Jury's Subpoena for Defendant to Provide Identification Evidence . . . . . . . . . . 10
- Jury Bias . . . . . . . . . . 16
- Hearsay Investigative Background Testimony by Special Agent Ortíz . . . . . . . . . . 17
- Special Agent Ortíz's Hearsay Testimony Regarding a Remark by the Defendant . . . . . . . . . . 20
- The Sufficiency of the Evidence . . . . . . . . . . 27

V. Conclusion . . . . . . . . . . 31


- I -

Procedural Background

On September 3, 2003, a Grand Jury returned a three-count Superseding Indictment charging José Antonio García-Ortíz (the "defendant") with: the knowing and intentional obstruction of interstate commerce by robbery of Ralph's Food Warehouse, in violation of 18 U.S.C. §§ 2 and 1951(a) ("Hobbs Act"); knowingly and unlawfully carrying and using firearms during, in relation to, and in furtherance of the aforementioned crime of violence, in violation of 18 U.S.C. §§ 2 and 924(c)(1)(A); and unlawfully causing the killing of a co-

conspirator, with malice aforethought, during the perpetration of said robbery, in violation of 18 U.S.C. §§ 2 and 924(j). (Docket No. 134).[1]

Jury selection began on July 19, 2004. Verdicts of guilty as to each charge were returned on August 13, 2004, after a 14-day jury trial which included 2 days of deliberation. (Minutes of Proceedings, Docket Nos. 213, 217, 219-23, 225, 228-30, 233-34, 240, 243, 247; Verdict Forms, Docket Nos. 249-253; Transcripts, Docket Nos. 260-67, 269-72, 274).

On August 13, 2004, defendant was granted additional time to supplement a Fed.R.Crim.P. 29(a) motion for judgment of acquittal filed on August 10, 2004. (Docket Nos. 239, 247). On September 15, 2004, after the United States had filed its opposition thereto, defendant was granted permission to file and otherwise supplement his motion for judgment of acquittal pursuant to Fed.Rs.Crim.P. 29(a) and (c). (Docket Nos. 255-57). Reiterated extensions for additional time were granted as requested by the defendant. (Docket Nos. 268, 273, 275, 278). On August 2, 2005, the defendant finally filed a "Motion for the Entry of an Order of Judgment of Acquittal Pursuant to Rule 29 and/or Motion to Compel Court Interview of Juror, and/or a New Trial Pursuant to Rule 33." (Docket No. 279). The United States filed its response in opposition on August 31, 2005; an amended response in opposition was filed on November 11, 2005. (Docket Nos. 281, 289).[2]

- II -

Factual Background

On December 9, 2000, Rafael Rivera-Aguayo, arrived at his work at 6:30 a.m., to perform duties as a security guard for Ralph's Food Warehouse Supermercados del Este

---

[1] The original Indictment was returned on March 15, 2001. (Docket No. 8).

[2] We note that the United States amended its original response only to include specific references to the trial transcript to its summary of the witnesses' testimonies. We thus consider the matter fully briefed by all parties and ready for disposition by the Court.

("RFW"), a supermarket located in the Municipality of Gurabo. While on duty that morning, RFW's assistant manager, Edgardo Figueroa-Rosa, summoned Mr. Rivera-Aguayo, who was wearing plain clothes and carrying a .357 Smith & Wesson revolver, to escort him to make a $63,000.00 (cash and check) bank deposit. Both men walked from the front entrance of the supermarket toward Mr. Figueroa-Rosa's car in RFW's parking lot, from where Mr. Figueroa-Rosa would drive to the bank accompanied by Mr. Rivera-Aguayo. En route to the car, Mr. Rivera-Aguayo was brandishing his weapon but was instructed by Mr. Figueroa-Rosa to conceal the same since it was close to midday. As they walked towards the car, Mr. Figueroa-Rosa noticed a green 4-door Intrepid which he immediately thought suspicious because of the way it was parked facing the supermarket's exit facilities. Two of RFW employees also noticed the Intrepid as they were walking across the parking lot during their lunch hour because it was parked in the supermarket's wholesale area "way back in the parking lot." As Mr. Figueroa-Rosa reached his car, holding the deposit bag with the money in one hand, he opened the front passenger door for Mr. Rivera-Aguayo and walked around the back of the car to seat himself in the driver's seat. As he was about to be fully seated, he saw 2 persons running towards them through the rear view mirror. One of the persons took hold of security guard, Mr. Rivera-Aguayo, and a struggle ensued between Mr. Rivera-Aguayo and the assailant.[3]

During the struggle, the manager, Mr. Figueroa-Rosa, heard a gunshot. Mr. Rivera-Aguayo's account was that he "felt" or heard a shot right before he got inside, pulled out his revolver, and returned fire. When Mr. Figueroa-Rosa heard the shots he laid down on the ground beside his car, placing the deposit bag in front of his hands. In the meantime,

---

[3] "T.T." denotes "Trial Transcript." T.T. July 27, 2004, pp. 41-47, 85-90; T.T. July 28, 2004, pp. 54-59.

unbeknownst to Mr. Figueroa-Rosa, Mr. Rivera-Aguayo, the security guard, had taken cover inside the car lying between its two rows of seats. Other persons from inside the green Intrepid vehicle, which had now positioned itself 10 to 15 feet in front of the manager's car, continued shooting. Mr. Rivera-Aguayo also continued firing his weapon until he ran out of bullets. When the shooting ceased, Mr. Figueroa-Rosa was lying down beside his car and could not see Mr. Rivera-Aguayo, who had apparently killed one of the persons who had shot him. Although Mr. Rivera-Aguayo could not see anybody inside the green vehicle during the exchange, after he ran out of bullets he saw a person approach, clad with white tennis shoes, and walk around the back of the manager's car. Mr. Rivera-Aguayo knew the manager was lying on the ground, but Mr. Rivera-Aguayo could not see what the assailant was doing; he remained under cover until the green vehicle pulled off. Mr. Figueroa-Rosa had noticed that the second person that had been running towards his car was wearing a white shirt and jeans.[4]

After the shooting ceased Mr. Figueroa-Rosa heard a person running towards him while voices farther away, coming from the Intrepid vehicle, repeated urged to "kill him." He then felt someone take the deposit bag from his hand while, keeping his eyes on the ground, he begged for mercy never seeing the person's face, only his white tennis shoes. He then heard two more shots and then saw the Intrepid speed away. Mr. Figueroa-Rosa then got up and saw Mr. Rivera-Aguayo first inside the car, wounded, and then, immediately thereater, walking in a state of shock; his clothes had blood stains.[5]

The two employees of RFW who had also noticed the green Intrepid during their

---

[4] T.T. July 27, 2004, pp. 47- 52, 90-99; T.T. July 28, 2004, pp. 60-72, 100-110; T.T. July 29, 2004, pp. 13-17; T.T. August 2, 2004, pp. 98-99.

[5] See, n.4, ante.

lunch hour also saw the silhouette of a person shooting as the vehicle positioned itself behind Mr. Figueroa-Rosa's car. They saw the person exit the vehicle shooting, bend and pick up the deposit bag, and then return to the Intrepid which then sped away. One of the employees noticed that the person, who had blood on the face, was wearing blue jeans and a blue t-shirt with white stripes. One of RFW's employee baggers was placing groceries in an SUV-vehicle at the parking lot and also witnessed the shooting begin. He hid inside the vehicle when the shooting began and, through the back window of the SUV, was able to see two persons both shooting towards the assistant manager's Honda vehicle; he described one of them as having grayish hair, light-dark colored skin, and wearing jewelry, while the other was tall, dark, with short black hair, and about 150 pounds. He also saw one of those two persons fall to the ground.[6]

Mr. Figueroa-Rosa, after the shooting had ended and having perceived the wounded condition of Mr. Rivera-Aguayo, called out to an employee who had a car and together they drove Mr. Rivera-Aguayo, who had received a gunshot wound in the chest, piercing his left lung, to the Gurabo Hospital, from where he was taken to the Medical Center. Although Mr. Figueroa-Rosa saw one of the assailants lying on the ground nearby he could not approach him as he was helping Mr. Rivera-Aguayo. The RFW bagger at the scene, however, noticed a revolver lying to the right of the dead assailant. It was later determined that this weapon was a 357 magnum, short barrel revolver, six rounds. It was recovered at the crime scene along with some spent shells and live bullets; other vehicles, such as the assistant manager's Honda, were also examined as part of the crime scene. This and other evidence recovered at the crime scene was secured by the Puerto Rico Police and processed by the

[6] See, n.4, ante.

Forensic Sciences Institute, who also performed an autopsy on the deceased assailant.[7]

Shortly after the Puerto Rico Police Department officers arrived at the crime scene and cordoned-off the area, they received a dispatch message regarding an abandoned Intrepid vehicle at the Mamey II ward, five minutes away from RFW facilities. Upon verifying the license plate number at the scene of the abandoned Intrepid, while a police helicopter provided surveillance, they ascertained that the green, four-door, Chrysler Intrepid had been reported stolen by its owner in November 2000. At the time it was stolen, however, the vehicle's windows had not been tinted. When the police recovered the Intrepid, one of the car's window had a bullet hole and the back window was completely broken, and the back seat behind the front passenger's seat bore a red shiny stain that appeared to be blood. Inside the vehicle, in the driver's area, the police also found a shell casing. The vehicle was secured as evidence and later turned over to the FBI for forensic analysis along with other evidence, including the deceased assailant's cellular phone. According to forensic analyses, a total of three weapons were fired during the robbery.[8]

During processing of the green Intrepid, the FBI observed and/or recovered, among others: a spent shell casing and a bullet shell in the front passenger's seat; a bullet impact in the outside frame of the rear window; bullet projectile fragments in the trunk; a bullet shell on the floor behind the driver's seat; a blood stain in the right back passenger's seat; and, nine fingerprints or fingerprint fragments none of which matched the defendant's. The car's ignition switch was broken. These findings were recorded by the intervening FBI special agents in Evidence Recovery and Fingerprints Logs. Several swabs of the stain in the rear

---

[7] T.T. July 27, 2004, pp. 99-101; T.T. July 28, 2004, pp. 112-13; T.T. July 29, 2004, pp. 20-21, 153-165; T.T. August 2, 2004, pp. 10-15, 58-60, 73-74.

[8] T.T. July 28, 2004, pp. 86-97; T.T. July 29, 2004, pp. 136-145, 150; T.T. August 2, 2004, pp. 16-18, 60, 85, 90; T.T. August 6, 2004, p. 101.

back seat and portions thereof were processed for lab analysis, yielding positive results for blood.[9]

Aside from the assailants' vehicle's green color, Mr. Rivera-Aguayo was unable to provide law enforcement officers further information concerning its description or the assailants. Although Mr. Rivera-Aguayo could not recall the green vehicle's make and model or identify the assailants from a photo array, during an interview with the police while at the hospital, he recalled hearing the manager plead for his life underneath the car.[10]

During the course of the investigation, federal law enforcement agents obtained reliable information that the defendant had taken part in the robbery. Defendant had been photographed prior thereto with the deceased assailant at a mechanic shop which had been under surveillance prior to the RFW robbery because its owner, Benjamín Meléndez, was suspected to be part of an organization involved in armed robberies of armored cars.[11]

Defendant was later subpoenaed to appear at the Federal Bureau of Investigation's ("FBI") offices in San Juan to provide blood, hair, saliva, and fingerprint samples. At the time he went to the FBI, accompanied by counsel, defendant wore a bandage on his right shoulder, which was discovered during a consent body search. The bandaged injury's appearance was consistent with a bullet puncture/entry wound's, the size of a nickel. X-rays taken at the Medical Center revealed metal fragments lodged in the back of defendant's right shoulder. Blood, saliva and fingerprint samples were also taken and sent

---

[9] T.T. August 2, 2004, pp. 114-137; T.T. August 3, 2004, pp. 30-35, 40-53, 65-70, 75.

[10] T.T. July 27, 2004, pp. 52-53; 58-61; T.T. July 29, 2004, pp. 106-107, 128-129; T.T. August 2, 2004, pp. 61-62, 95-98.

[11] On September/October of 2000, the defendant also participated in a robbery with Benjamín Meléndez. Same took place in a shopping center in front of a Banco Popular Branch. See, n.15, infra, for details.

to the FBI Laboratory to compare, along with samples taken from six other individuals, with the evidence recovered at the crime scene. DNA typing tests performed at the FBI Laboratory confirmed the presence of blood in the Intrepid's rear passenger seat and matched with that of the defendant as its source, while excluding all others as potential contributors. Defendant was arrested upon receipt of the results.[12]

At the time of the robbery, RFW consisted of a chain of four supermarkets all located in Puerto Rico. During the normal course of business RFW purchases goods from local vendors, and purchases directly from 10 to 15 vendors located in the continental United States, such as: the Quirch Food Company, located in Miami, Florida; Walton and Post, located in Miami, Florida; United Oil, locted in Miami, Florida; Global Marketing Associates, located in Atlanta, Georgia. RFW's Central Office in Las Piedras handled purchases directly from the continental United States vendors, whose products were then distributed to RFW's supermarket chain. Business with state-side vendors is significant, estimated in the millions of dollars.[13]

---

[12] T.T. July 29, 2004, pp. 38-83, 120-121, 130-133; T.T. August 2, 2004, pp. 139-152; T.T. August 3, 2004, pp. 59-64, 79; T.T. August 4, 2004, pp. 58-77; T.T. August 5, 2004, pp. 115-116; T.T. August 6, 2004, pp. 41-43, 54-71, 104-146; T.T. August 9, 2004, pp. 44-57, 82-93.

The parties entered into Stipulations concerning: the autopsy of Reinaldo Rolón Rivera, the deceased assailant (Docket No. 236); the FBI's Report of Examination concluding that finger and palm prints recovered did not match defendant's (Docket No. 237); and, the FBI's Report of Examination concluding that items and specimens recovered from the Intrepid vehicle were microscopically examined for head hair samples provided by the defendant, but none were found. (Docket No. 238). (T.T. August 9, 2004, pp. 73-80).

[13] T.T. July 27, 2004, pp. 76-85; T.T. July 28, 2004, pp. 30-50.

- III -

Applicable Legal Standards

Pursuant to Fed.R.Crim.P. 29, the District Court examines the sufficiency of the evidence to determine if "after reviewing all the evidence in the light most favorable to the government and drawing all reasonable inferences in its favor, we [can] conclude that a rational jury could find the essential elements of the crime proved beyond a reasonable doubt." United States v. Isler, ___ F.3d ___, 2005 WL 3061975, *2 (1st Cir. Nov. 16, 2005). "We need not be convinced that the government succeeded in 'eliminating every possible theory consistent with the defendant's innocence.' United States v. Moran, 312 F.3d 480, 487 (1st Cir.2002). Rather, we simply consider 'all the evidence, direct and circumstantial, and resolve all evidentiary conflicts in favor of the verdict.' United States v. Hernández, 146 F.3d 30, 32 (1st Cir.1998)." United States v. Boulerice, 325 F.3d 75, 79 (1st Cir. 2003).

On the other hand, "Fed.R.Crim.P. 33 permits a defendant to move for a new trial in the interest of justice. In contrast to a challenge to the legal sufficiency of the evidence under Fed.R.Crim.P. 29, a motion for a new trial under Rule 33 permits the court to evaluate the weight of the evidence and the credibility of the witnesses. However, only in exceptional circumstances may the Court reject the jury's assessment of witness credibility, such as where the testimony is patently incredible or defies physical realities. And even when the court concludes that a government witness was not credible, it should not grant a new trial unless it would be a manifest injustice to let the verdict stand, i.e., where, in light of the record as a whole, there is a real concern that an innocent person may have been convicted." United States v. Dipietro, ___ F.Supp.3d ___, 2005 WL 1863817 (S.D.N.Y. Aug. 5, 2005) (internal citations and quotations omitted).

- IV -

Analysis

The defendant argues that: the evidence is insufficient to support the jury's verdict of guilty as to all counts of the Superseding Indictment; an improper post-trial jury contact between defense witness Magda Ballester ("Ballester") and one of the jurors indicates that the jury was biased and that a new trial is warranted; the Court should grant a new trial due to government misconduct for subpoenaing the defendant without cause and for improperly revealing incriminating statements attributed to the defendant by way of the case agent's trial testimony.

The Grand Jury's Subpoena for Defendant to Provide Identification Evidence

Defendant alleges that the United States lacked probable cause to issue a subpoena for identification evidence and that counsel's failure to challenge the subpoena denotes ineffective assistance of counsel. According to the defendant, the subpoenas were requested "based on rumors" and with the sole and redundant purpose of garnishing information to substantiate those "rumors." Whether counsel was ineffective or not in failing to move to quash the subpoena, is course for another menu at a future date.[14] For all practical purposes, at this juncture we deem defendant's compliance with the subpoena to be both counseled and voluntarily.

We begin with an excerpt of defense counsel's cross-examination of S/A Ortíz to provide the proper background to this issue:

DEFENSE: Did you get any independent evidence prior to you issuing the subpoena that (sic) what these two street-people were saying, had some value?

S/A ORTIZ: It was all multiple source information, whether there were documented sources or just rumors on the streets.

---

[14] See, n. 23, infra.

DEFENSE: Rumors?

S/A ORTIZ: Rumors or people talking, sources of information, just the fact that the deceased victim was an associate and member of a gang, it all collected, all together.

[...,]

When we go out in the streets to investigate, that's what he (sic) do, we contact people. And with that that leads us to investigate and gather evidence.

[...,]

DEFENSE: What did you do to verify the rumor before you got the subpoena? That's what I'm asking you.

[...,]

S/A ORTIZ: I corroborated the rumors with a subpoena, with the results of it.

(T.T. July 29, 2004, pp. 116-118).

The Court's findings concerning probable cause to request issuance of the subpoena rested on the agents' collective knowledge based on their investigation of a gang, which included information gathered from confidential informants and others, as well as prior surveillance information which, prior to the assault at the RFW, linked the defendant to the deceased assailant, a known gang member:[15]

---

[15] During trial, S/A William Ortíz testified concerning his experience in introducing confidential informants into gangs. According to Ortíz, since 2000 he had been investigating a gang led by an individual named "Benjamín Meléndez" in connection to "chop shop" and robbery activities. (T.T. July 29, 2004, pp. 85-89). As part of the surveillance of the gang, the FBI installed pole cameras in the vicinity of Meléndez's "chop-shop" in Bayamón, observed Meléndez at his residence, and photographed individuals associated with Meléndez. (T.T. July 29, 2004, pp. 95-99, 110). Confidential sources informed the agents that Meléndez and his associates were involved in the robbery. (T.T. July 29, 2004, p. 107). In particular, within days of RFW's robbery S/A Ortíz received confidential information that the defendant was involved in the robbery with Meléndez. (T.T. July 29, 2004, pp. 107, 114-115, 117, 129-130). During a sidebar conference, the prosecutor informed that the agents had a photograph depicting both the defendant and the assailant that was killed during the RFW robbery. (T.T. July 29, 2004, p. 126). At a later date, the prosecutor further informed that the agents' surveillance logs indicated that on September or October, 2000 (prior to RFW's armed robbery on December 9, 2000), the defendant's vehicle was used during a robbery in front of a Banco Popular branch, that the defendant was seen with Meléndez and a co-hort getting into a car, and that the defendant and the others eventually went back to the garage. (T.T. August 6, 2004, pp. 113-114).

Evidence of the surveillance of Meléndez's auto repair shop was addressed in defendant's Motions to Suppress (Docket Nos. 111, 176) which were denied by the Court after a hearing. (Docket Nos. 172 [Minutes], 203 [Report and Recommendation], 215 [Opinion and Order]). Specifically, the following photographs were admitted as evidence at the December 2, 2003, Suppression Hearing: photograph of Meléndez's "chop-shop" in Bayamón; photographs of the defendant with Meléndez and the dead assailant; photographs (showing the license plate) of the

JUDGE: They have more than rumors. They have the car. They have blood. They have the car of the robbery. They have a bunch of people that say that was the car of the robbery.

AUSA: Discussions with other case agents.

JUDGE: This is not a case on a shoe string.

DEFENSE: Except that (sic) this defendant it is, because this (sic) focus is on Benjamín Meléndez.

JUDGE: And their gang. And he [referring to the defendant] is there. And he is there. And he is working there. And apparently seen there. He is also seen around his neighborhood.

[...,]

DEFENSE: Right. But none of the agents have anything on García Ortíz except the photo at the shop, prior to the issuance of the subpoena, a photo at the shop and that's it.

AUSA: Well, but the photo at the shop (sic) with the guy who subsequently committed a robbery and was killed.

(T.T. July 29, 2004, pp. 124-127).

AUSA: Let me be clear, because it was brought to my attention very recently that even during surveillance, when they started looking at the logs there was an allegation that he was involved with some other people in another robbery.

[...,]

This was information that was brought to the government's attention, maybe one or two days ago, in reference to the subpoena information.

I believe they were preparing for information on probable cause for the subpoenas and they went and looked at the logs, the surveillance logs, which you have. Some of it is surveillance of him coming and going. However, in September, October 5th of 2000, according to the agent, the defendant's vehicle was used during a robbery in front of Banco Popular. The defendant supposedly was seen with Benjamín Meléndez and Fernando Díaz Ruíz, getting into a car.

[...,]

They didn't actually see a robbery take place, but they did see the defendant and the other two people who eventually went back to the garage.

(T.T. August 6, 2004, pp. 113-114).

---

rear of defendant's car, which was used at the September/October 2000 robbery in front of a Banco Popular branch; photographs of the pole where the surveillance camera was mounted. (Docket No. 172 and Exhibit Lists; Government's Exhibits 1-2; Defendant's Exhibits A through C).

During the Suppression Hearing, the Court again addressed the issue of probable cause to issue the subpoena:

> ... I advised you at sidebar that in my opinion it's the conglomerate and sum of all the evidence of all the policemen that are working on the case. And I advised [defense counsel] that I believed that the sum of all that the officers than (sic) had, was sufficient to issue the subpoenas.

(July 30, 2004, Suppression Hearing Transcript, pp. 11-12).

We note that defense counsel had requested that the indictment be dismissed based on grand jury misconduct and requested information as to the source of the probable cause to issue the subpoena, including confidential sources which might prove exculpatory. The Court then agreed to interview the source of the information. (T.T. July 29, 2004, pp. 10-11).[16] In the end, the United States was unable to locate the confidential informer, and the Court consequently instructed the jury as follows, with the affirmative acquiescence of counsel:

> Before I read the instructions, there is an administrative matter that goes under evidence in this case that the Court should advise you, and that is that there was a testimony as to a confidential information provided by a confidential informer to Agent Ortíz relating to a source.
>
> Normally, confidential informers who are non-participators (sic), that is, who are not part of the group that perpetrated the crime, are not required to testify, but the Court is required to ask them if they want to subject themselves to questioning by the defendant.
>
> The decision belongs to the confidential informer. He is the one that decides if he is going to be interviewed or not. It is not the Court who decides; it is not the district attorney that decides; and it is not the defense counsel that decides whether or not the confidential informer is to testify.
>
> The Court requested the United States to locate the confidential informer of four years ago. The United States could not locate the informer. The Court interviewed the agent. And this is credibility. The Court interviewing the agent. The agent, who was in charge of it, testified to the Court that the year after the facts of this case, the agent testified that he lost track of the confidential informer. He asked him to return to him monthly for six months, and he lost him.

---

[16] See also, T.T. July 27, 2004, pp. 4-7; T.T. August 9, 2004, pp. 5-42;

> The United States then attempted to locate them through the source, through their sources, to see if he voluntarily wanted to be interviewed, and he could not be located. You are so advised.

(T.T. August 12, 2004, pp. 64-65).

We find guidance on the issues at hand in the case of In Re Grand Jury Proceedings Involving Vickers, 38 F.Supp.2d 159 (D.N.H. 1998), where District Judge McCauliffe, from the sister District of New Hampshire, examined a motion to quash a subpoena to provide identification evidence, to wit, major case prints, saliva, and hair samples to a federal grand jury investigating pipe bombing incidents which occurred in Concord, New Hampshire. The defendants did not comply with the subpoena and the Court entered an order to show cause as to why they should not be held in contempt.

The defendants then claimed, among other matters, that "the only means by which the grand jury can obtain the requested evidence without unlawfully imposing on their constitutional rights is by obtaining a search warrant, supported by probable cause and issued by a neutral and detached judicial officer." Vickers, 38 F.Supp.2d at 161.

Judge McCauliffe, in the context of the grand jury's unique and historical function "as an independent investigatory body which acts as a buffer between the citizenry and government," id., at 162, recognized that "the Court has been reluctant to measure the enforceability of grand jury subpoenas against the same standards applicable to search warrants." Id.

A two-prong reasonableness assessment is then applied in deciding whether the subject matter and scope of the subpoena are reasonable under the circumstances by determining "whether (1) respondents' constitutional rights are implicated by the subpoenas [...,] and (2) whether respondents have stated adequate grounds to justify quashing the subpoenas." Id., at 163-164.

The Court stressed as to the relevant inquiry:

> It is important to remember that even when a citizen's Fourth Amendment rights are arguably implicated by a grand jury's subpoena, the relevant inquiry is not whether the subpoena is supported by probable cause. Instead, the court must simply determine whether the subject matter and scope of the subpoena are reasonable under the circumstances, including consideration of the subpoenaed person's Constitutional rights.

Id., at 164 (internal punctuation and citations omitted).

The Vickers court distinguished between items or characteristics that individuals have on public display (such as hair, fingerprints, voice, and handwriting) and those which "involve[] an undeniable intrusion compromising their right to bodily integrity, their Fourth Amendment right to be free from unreasonable searches and seizures..." Id., at 165, such as saliva and blood samples.

In the case at bar, defendant's counseled consent to provide the identification evidence sought by subpoena ends our inquest. We have no indication that the consent to the subpoena was anything but voluntary. Furthermore, it appears that, in light of the collective investigative information available to the prosecution at the time of the subpoena's issuance, had defendant moved to quash the subpoena, the reasonableness of the intrusion on defendant's bodily integrity and privacy would have yielded to the grand jury's legitimate need to obtain evidence.[17]

The Court thus declines the invitation to order a new trial based on these grounds.

---

[17] The Court applied this balancing test in its denial of the Government's Motion to Remove Bullet from Defendant. (Docket Nos. 75, 108). See also, United States v. GinésPérez, 214 F.Supp.2d 205, 215-216 (D.P.R. 2002), vacated and remanded on other grounds, 90 Fed.Appx. 3 (1st Cir. 2004) (unpublished opinion No. 02-2707) (holding that probable cause determination for arrest may rest on agents' collective knowledge and information), citing United States v. Rose, 541 F.2d 750, 756 (8th Cir. 1976), cert. denied, 430 U.S. 908, 97 S.Ct. 1178, 51 L.Ed.2d 584 (1977); United States v. Cruz, 834 F.2d 47, 51 (2nd Cir. 1987) (holding that determination of whether probable cause to arrest exists can be based on the collective knowledge of all of the officers involved in the surveillance efforts).

Jury Bias

Defendant submits that a new trial is warranted because the jury's verdict was tainted by the improper influence of one of the jurors, who was familiar with Ms. Ballester, his common law wife and a witness for the defense. In support of his proposition defendant submits Ballester's August 1, 2005 Sworn Statement (Docket No. 279-2) of a December 2004 casual encounter and conversation with the juror:

> In addition to telling me that he had advised the courtroom deputy that he knew me, [he] told me limited details of the jury's deliberation. He told me that the jurors were split for some time. More were in favor of acquitting García Ortíz than were in favor of convicting him. In response, I asked him why then did they decide to convict him. [He] responded that the jury took long in reaching the verdict, as they were confused with the DNA and the robbery, but stated he could not give me any further details due to confidentiality.

In her Sworn Statement, Ballester also acknowledges that she noticed the juror as she "was declaring" and that she knows him since high school at which time he was one of her best friend's boyfriend.

According to the defendant, the juror's succint statement to Ballester denotes, "uncertainty and intimation of undisclosed influences [and] provides a reasonable ground for investigation, warranting an inquiry." (Docket No. 279 at 8).

We disagree. First, the short Sworn Statement by Ms. Ballester fails to provide any evidence as to any wrongdoing by any juror during deliberations. Second, "a district court is obliged to investigate plausible allegations of improper influence on a jury verdict." United States v. Meader, 118 F.3d 876, 880 (1st Cir. 1997) (emphasis supplied). Shielding jury deliberations from public scrutiny is an important policy, zealously implemented to protect the finality of jury verdicts and the privacy of the jurors' deliberations. See, generally, United States v. Walsh, 75 F.3d 1, 7 (1st Cir. 1996).

> There is little doubt that postverdict investigations into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system would survive such efforts to perfect it. Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time in days, weeks, **or months after the verdict**, seriously disrupt the finality of the process.

Tanner v. United States, 483 U.S. 107, 120, 107 S.Ct. 2739, 2747, 97 L.Ed.2d 90 (1987) (emphasis ours).

Accordingly, we decline to hold any post-verdict inquiry, or grant a new trial, based on the sparse assertions made by Ms. Ballester in her protracted Sworn Statement.[18]

We have thoroughly reviewed the record of the entire proceedings and have found no indication that defendant's right to an impartial jury was violated. Therefore, defendant's request for the Court to conduct a post-verdict interview of the juror and thereafter order a new trial is DENIED.

Hearsay Investigative Background Testimony by Special Agent Ortíz

Defendant requests a new trial based on the prejudicial impact of FBI Special Agent William Ortíz's (S/A Ortíz) hearsay testimony that, "José García Ortíz and others had committed a robbery at a food warehouse in Gurabo" (T.T. August 29, 2004, p. 35), and "requested Grand Jury subpoenas compelling García Ortíz and others to provide the FBI with hair, saliva, fingerprints, blood." (T.T. August 29, 2004, p. 36). According to the defendant, S/A Ortíz's testimony was an assertion of guilt based on "an out-of-court testimonial statement uttered by a declarant that the defense had no opportunity to cross-examine." (Docket No. 279 at 28). Defendant further alleges that the testimony was

[18] While Ballester recognized the juror when she was on the witness stand on August 10, 2004 (Docket No. 267), she waited until August 1, 2005, over one year after her testimony at trial and eight months after her casual encounter with the juror, to submit the Sworn Statement.

deliberately offered in bad faith and with the intent to prejudice the defendant conveying to the jury the idea that the government's efforts to gather evidence was simply to confirm, not to ascertain, defendant's participation in the robbery. He urges the Court to grant a new trial based on the testimony's prejudicial effect on the jury and its irrevocable corruption of the presumption of innocence.

Prior to discussing the issue in depth we pause to note that, according to the defendant, the testimony was elicited over his objections as to its hearsay nature. (Docket No. 279 at 14). The Court quotes at length from the trial transcript for context:

AUSA: Sir, directing your attention to the year 2000, November, December timeframe, did you become involved in the investigation of a robbery that took place in Ralph's Food Warehouse?

S/A ORTIZ: Yes.

AUSA: And, sir, how did you become involved in that investigation?

S/A ORTIZ: I received information from a fellow officer indicating that –

DEFENSE: Objection as to what he received from the fellow officer. It's hearsay.

JUDGE: Just tell us what you did as a consequence of what he told you.

S/A ORTIZ: As a consequence of information received, I became involved in the investigation of the robbery.

We learned that José García Ortíz –

DEFENSE: Objection as to what "we learned," your Honor.

S/A ORTIZ: I heard learned that José García Ortíz and others had committed a robbery at a food warehouse in Gurabo.

AUSA: And, sir, after getting that information, what did you do?

S/A ORTIZ: With the information that I had, I requested Grand Jury subpoenas compelling García-Ortíz and other to provide the FBI with hair, saliva, fingerprints, blood. And with that, we had García-Ortíz come to the FBI office.

DEFENSE: Objection as to what 'we' did, Your Honor. This detective, this seasoned detective, he knows how to testify. He knows we are here to hear what he has to say.

JUDGE: Refer to yourself.

(T.T. August 29, 2004, pp. 35-36).

The record clearly conveys that the nature of the objection as to "hearsay" was not what the defendant now argues and that he was satisfied with the Court's instructions to the witness to refer only to himself when testifying. The record also clearly conveys that S/A Ortíz's testimony was not offered for the truth of the matter, in violation of Fed. R. Evid. 801(c), but rather as background testimony.

In United States v. Riccardi, 258 F.Supp.2d 1212, 1236 (D. Kansas, 2003), the government offered out of court statements through the testimony of detectives to explain why they conducted the investigation. Relying on the case of United States v. Freeman, 816 F.2d 558, 563 (10th Cir. 1987), which held that "out of court statements are not hearsay when offered for the limited purpose of explaining why a Government investigation was undertaken," the court held that the testimony was not hearsay under Fed. R. Evid. 801(c).

Here, as in Riccardi, the case agent's "testimony regarding background investigatory information was not offered to prove the truth of the matter asserted, but instead, to explain how [he] became involved in this case and why [he] undertook certain investigatory steps."

In sum, defendant's interpretation concerning the nature and context of his objection at trial concerning S/A Ortíz's testimony is belied by the record. The admission of said testimony did not defeat the defendant's rights under the Confrontation Clause nor did it usurp the function of the jury. Defendant offers no evidence or concrete argument which would plausibly suggest that the jury failed to follow the Court's instructions and return a verdict based on its own interpretation of the overwhelming evidence. Accordingly, we deny his request for a new trial.

> A harmless error analysis is case specific, and requires consideration of such factors as the "centrality of the tainted evidence, its uniqueness, its prejudicial impact, the use to which the evidence was put, and the relative strengths of the parties' cases."

United States v. Isler, 429 F.3d 19, 26 (1st Cir. 2005), citing United States v. García-Morales, 382 F.3d 12, 17 (1st Cir. 2004).

The testimony, even if admitted in error is harmless in nature since there is plenty of evidence linking the defendant to the crime: defendant was observed during surveillance of an illegal "chop shop" operation and photographed with others associated in criminal activities, including the assailant killed during the RFW robbery; he was found to have sustained a bullet wound which fit the eyewitnesses' account of the robbery; his DNA was matched to defendant's blood in the analyses of blood samples recovered from the robbery's getaway vehicle.

Special Agent Ortíz's Hearsay Testimony Regarding a Remark by the Defendant

Defendant further grounds his request for a new trial based on the prejudicial effect of S/A Ortíz's testimony concerning a remark made by the defendant as FBI agents executed a consensual body viewing at the FBI's San Juan Office.

Defendant raised the issue concerning discovery of the remark prior to the Court's preliminary instructions to the jury:[19]

DEFENSE: There was a question as to whether there was in fact a statement made by this defendant. And I'm not clear whether this defendant moved to suppress. Obviously, the Court did rule during trial, but I just want to make sure we don't refer to an opening until we determine what is related to that.

JUDGE: That was the decision the Court had postponed; right?

DEFENSE: That's correct. But there is also an issue as to whether in fact there was a statement, because I had some documents produced in discovery to me by Agent Marchand,

---

[19] At the time, there was a pending motion regarding the defendant's remark. (T.T. July 29, 2004, p. 64).

a note to the government saying that this defendant gave no statement to any agent. Then I was told there was an (sic) statement. So he did or he didn't.

[...,]

AUSA: Your Honor, I informed [defense counsel] previously that there were a couple of statements that may be attributed to the defendant. These were statements that were made by [the defendant] to one of the case agents. It was not a statement, a formal statement that was taken down or reduced to writing.

For example, in one occasion when they were doing a visual observation of the defendant's body, he stated that the injury was caused by a mole or something along those lines.

There was also some further statement that was made that the injury was sustained in another event, another robbery, perhaps in Caguas.

The information was provided to [defense counsel].

(T.T. July 27, 2004, pp. 7-8).

The United States made reference to the defendant's remark to the case agent in its opening statement:

> The individuals reported to the FBI building, Mr. García among them. Mr. García consented to a visual examination of his body. I told you they thought he was shot. They looked at his lower torso. They didn't see anything. No sign that he had been shot. Then they said let me see your upper body. So Mr. García raised his shirt up. No sign of any shot. No sign of injury. Then they said, "Well, raise it up a little bit more," because they felt Mr. García was hiding something. They noticed a Band-Aid on the upper right shoulder. They said, "What's this?" According to the agent who indicated that Mr. García said it was a mole or a pimple.
>
> But the agent was suspicious, because to him it looked more like a gunshot. Perfectly []round. It was relatively fresh in that it had not healed. So he says, "Mr. García, how about taking an X-ray?"
>
> He and his counsel – not the counsel he is with now – consented to take an X-ray. They went to Centro Médico. A doctor who will testify here before you will indicate, "I've been doing this for the last ten years. It looks like a gunshot to me."
>
> They sent him to X-ray. And what do they see? A metallic object in his lower back. It's a bullet. The doctor will testify it's a bullet.

(T.T. July 27, 2004, pp. 31-32).[20]

---

[20] The Court allowed the jury, not the doctor, to make the determination as to whether the x-ray depicted a bullet.

JUDGE: I am going to allow that they use "fragment" and not "bullet."

DEFENSE: Thank you.

AUSA: Even where it says suspected bullet lesion, that has to be deleted; is that correct?

During trial, defense counsel raised the issue once again, when the case agent testified as to the defendant's remark. We refer to the trial transcript to examine the nature of the testimony and the objection in their proper context:

> AUSA: Very well. After Mr. García pulled his shirt up, what did you see, sir?
>
> DEFENSE: Your Honor, I renew my objection.[21]
>
> JUDGE: Overruled.
>
> S/A ORTIZ: I saw the whole bandage.

---

> JUDGE: Yes, take that out. They can say that there is a fragment there, and they can also describe the shape and they can – he who saw the hole, if anyone saw the hole, they can the (sic) testify that there was a hole there, fine. Let the jury decide.

(T.T. August 6, 2000, p. 31).

As a result of the defense's objection to the prosecutor's use of the word "projectile" during direct examination of the radiologist, Dr. Gladys Pérez-Kraft (T.T. August 6, 2000, p. 69), the Court gave the jury the following instruction:

> Ladies and Gentlemen of the Jury, relating to the pieces of fragments that were in the body of the defendant, if they were, if they were. That's up to you to decide. The correct word is "fragments" and nothing else.
>
> And one of the issues of the many issues that you will have to decide, once you consider all the evidence in its totality, is what are those fragments, if you do accept that those are fragments, because you also have the option of not accepting the testimony of the two attending physicians.
>
> You will determine what the factual scenario is, and any conclusion otherwise is erroneous as to a conclusion. A conclusion would belong to the jury what those fragments are and if there were any fragments there. Okay?

(T.T. August 6, 2000, pp. 74-75).

[21] The objection that defendant "renews" in this instance is as to S/A Ortíz's testimony was regarding his capacity to give an opinion as to the nature of the wound:

> I have an objection to this agent testifying to what he believed to be a gunshot wound. There has been absolutely no basis for his expertise in knowing what a gunshot wound is, how many he has seen,. And I just think he is unqualified to testify. They can put that through someone else.
>
> We have also have (sic) been contesting from day one whether it is a bullet involved or a metal fragment, whatever it is.
>
> So I think the issue of whether it is a gunshot wound, this agent should not be allowed to open his mouth until he can show he is an expert in that.

(T.T. July 29, 2004, p. 44).

AUSA: And where was this bandage located?

S/A ORTIZ: On the right shoulder, behind.

AUSA: And what did you do after that?

S/A ORTIZ: I asked Mr. García-Ortíz what that was.

AUSA: And what did he say?

S/A ORTIZ: That it was a mole.

DEFENSE: Objection as to the statement, Your Honor. May we approach again?

JUDGE: Yes.

DEFENSE: Your Honor, I filed a motion to suppress any statements. I was told that there were no statements given. It still has not been clarified as to what was going on, whether there was a statement or there wasn't a statement. And there has been no ruling on it. And he could have held it to the end until we get a ruling on it.

AUSA: I wasn't aware of anything that hadn't been ruled on. But at the same time, I did write [defense counsel] at least two correspondences.

JUDGE: Why should the Court suppress the statement made by him? Because the lawyer was there. It was made in front of his lawyer.

DEFENSE: Because the directions that were made by the attorney were for him to show, not whether he would say anything or answer any questions. I don't know that, and neither does the Court know that, whether he was even told that he could speak or not to speak, whether anything he said could be used against him.

I mean, he's got a subpoena to show, and he complied with tat. No one advised him whether if he made a statement it could be used against him.

AUSA: He had counsel present there.

DEFENSE: But that doesn't mean anything. Because counsel was there for the viewing. And nobody advised him of his right to remain silent. And I have a document from this agent, signed in his own handwriting, saying that he made no statements.

[...,]

I think to even expand on the issue, Your Honor, is that if you are brought in with counsel for one particular purpose, and counsel advises him – because I think the Court would have a right to say whether they advised him or whether they know about this during a hearing, they advised him you are here to show – he was never Mirandized, period.

But he consented to the showing, I understand that. I have to eat that. But I certainly don't have to eat the fact that they didn't Mirandize him to make this statement.

JUDGE: But if he hadn't consented, the result would have been the same.

DEFENSE: If he had not consented, they would have had a hearing on the subpoena, and then perhaps we wouldn't be here today, because all this basis for the subpoena would have come out. But for whatever reason, counsel didn't do it.

AUSA: Another issue concerning whether or not the statement was propounded to the defendant to illicit (sic) any type of incriminating information. This was for the purpose of 'what's the Band-Aid for?" His attorney was there, had an obligation or an opportunity to either tell his client to say nothing or to admit.

DEFENSE: Of course, it was to illicit (sic) information. That's why he was there, to illicit (sic) information.

AUSA: It doesn't in an (sic) of itself constitute an incriminating statement.

DEFENSE: But the bottom line is they should have had a hearing.

JUDGE: What I'm going to [do] is, I am going to temporarily advise the jury not to take into consideration the statement as to the mole, while I review the jurisprudence of whether or not a Miranda warning is required if there is a counsel present with the person.

DEFENSE: Quite frankly, Your Honor, how can the Court do that without a hearing? Perhaps I need to have Mr. Noriega testify. That was my purpose in asking for a suppression hearing on this issue. But when they indicated there were no statements, there is no statements. Quite frankly, I don't know why they needed a statement. They wanted – they opened up a can of worms, and I vote for a mistrial.

(T.T. July 29, 2004, pp. 48-54).

The Court heard legal arguments from the parties and, after reminding the jury of its preliminary instructions concerning excluded evidence, instructed the jury to, "Please disregard – I am ordering you to disregard the statement attributed to the defendant that the injury that he allegedly had on his shoulder was a mole." (T.T. July 29, 2004, p. 72).

The Court ultimately held a Suppression Hearing on the issue. (T.T. July 30, 2004 - Docket No. 263). After the United States concluded its case-in-chief, the Court ruled against suppression of the remark:[22]

---

[22] The Court had advised the parties concerning its inclination to admit the reference to the remark:

> ...the Court is now inclined to accept that the mole statement be admitted.
>
> [...,]
>
> Basically, what the Court would do is that, before you start your case, the Court will simply make a brief statement that the statement attributed to the defendant by the agent who so testified, who was agent –
>
> William Ortíz, is a statement that the Court will permit subject to their credibility and a special instruction, which the Court would be providing, relating to statements made

> All right. Therefore, the case is over, except for one matter, and that is the Court, relating to the testimony of William Ortíz, the Court suppressed a question and an answer relating to the injury received by the defendant, the injury that the defendant had in his back. The question and the answer were suppressed.
>
> The Court reconsiders that and allows the question and the answer to be considered for credibility and weight analysis for the jury to make, the question and the answer related to the nature of the injury in the shoulder of the defendant stated by Mr. William Ortíz, attributed to the defendant.

(T.T. August 10, 2004, pp. 86-87).

Defendant then objected and requested an opportunity to cross-examine S/A Ortíz on the matter, whereupon the United States stated it's "willingness to allow that ruling to stand so that we don't have to [bring S/A Ortíz in]." (T.T. August 10, 2004, p. 88). The Court then reconsidered its decision not to suppress:

> The Court further reconsiders and advises that because the agent is no longer in Puerto Rico and the defendant could have cross-examined him on that point, therefore, the ruling stands. Since the agent is not available, then the question and the answer continues to be suppressed.

(T.T. August 10, 2004, p. 89).

We start the analysis at the beginning of the questioned remark. At the time defendant uttered the remark concerning the mole he was accompanied by counsel and had not invoked his Miranda rights, nor invoked them after the remark. Therefore, it would have been reasonable to conclude that he waived the Miranda challenge. Nonetheless, waiver aside, the Court fully entertained defendant's request to suppress the testimony in reference to his remark to the case agent during execution of the consensual body viewing, which defendant attempted to "piggy-back" to an ineffective assistance of counsel claim.[23]

---

> allegedly by the defendant.

(T.T. August 9, 2004, pp. 70-71).

[23] Thus, we take no view concerning any such claim, if feasible, at this time as this matter is premature. Clearly, this would be a matter subject to an inquiry into matters outside the record within the context of 28 U.S.C. § 2255. "The United States District Court has no jurisdiction to consider a § 2255 petition until there is a final judgment and no judgment will be entered until after sentencing." United States v. Snegirev, ___ F.Supp.2d ___, 2005 WL 2122096, *2 (D. Alaska, August 29, 2005).

In the end, the remark was suppressed and the jury retired to deliberate with specific instructions by the Court to disregard the testimony concerning the defendant's remark to the case agent.

In United States v. Genao, 281 F.3d 305 (1st Cir. 2002), the First Circuit Court of Appeals affirmed the admission of the defendant's uncoerced statements or confessions during the execution of a search warrant. When the team of officers arrived to execute a search warrant for a second-floor apartment, the defendant identified himself as the landlord of the apartment building and signed a consent form authorizing the police to enter the second and third-floor apartments and the basement. The officers seized heroin, weighing and packaging material, handguns and ammunition from the third-floor apartment. One of the officers then showed the seized items to the defendant and stated, "We've got a problem here" to which the defendant responded, "Everything's mine. I don't want my wife to get in trouble." The officer then advised him of his Miranda rights, and the defendant repeated the statement. Genao, 281 F.3d at 308.

This Circuit Court ruled that the first confession was not the product of a Miranda violation because the officer's remark that, "We've got a problem here," did not amount to interrogation.

> For Miranda purposes, interrogation is express questioning or its functional equivalent. Interrogation occurs only when police conduct is reasonably likely to elicit an incriminating response from the suspect. Moreover, words or actions normally attendant to arrest and custody do not constitute interrogation.

---

We note that It would be unscrupulous to speculate, at this point, as to the propriety of defendant's previous counsel's strategies or choices at the time. Suffice it to state that the Court is not unacquainted with the challenges faced by even the most experienced criminal practitioners, who are sometimes forced to make decisions and provide counsel based on their clients' less than candid accounts.

Id., 281 F.3d at 310 (internal punctuation and citations omitted).

We apply an analysis similar to the one applied by this Circuit when examining the officers' asking Genao "whether the third floor was occupied, which prompted Genao to state that it was vacant, and that he was acting as the landlord." Id., at 311 n.5.

As in Genao, S/A Ortíz's question to the defendant as to "What's the Band-Aid for?" during the consent viewing of defendant's body seems "much more of an informational inquiry incident to the [body viewing] as opposed to a query designed to induce an inculpatory remark." Id.

It stands to reason that defendant's request for a new trial on the aforementioned grounds should be denied. The remark would have been admitted, and correctly so, were it not for the fact that the case agent was unavailable for cross-examination. We have no reason to doubt the jury's compliance with its duty to disregard any reference thereto which, if any, had little effect on the outcome of the trial given the overwhelming strength of the government's case.

The Sufficiency of the Evidence

Count One of the superseding indictment charged a Hobbs Act violation by way of the robbery of approximately $60,000 property of Ralph's Food Warehouse. Count Two of the Superseding Indictment charged the defendant with carrying and using a firearm in relation to a crime of violence. Count Three of the Superseding Indictment charged the defendant with murder – causing the killing of a co-conspirator, with malice aforethought and through the use of a firearm during the perpetration of the robbery. (Docket No. 134).

Defendant alleges that the evidence presented at trial is insufficient to uphold the conviction because: (1) the robbery had no effect on RFW's business and thus had no effect on interstate commerce; (2) there was no evidence that defendant actually or constructively

possessed a firearm in relation to the robbery; and, (3) there was no evidence that the defendant was at the scene of the robbery and therefore he could not have caused the killing of a co-conspirator.

Defendant suggests that the robbery had no effect in RFW's ability to conduct commerce, much less the interstate commerce. He grounds his argument in the fact that RFW continued operations without interruption.

"The Hobbs Act prohibits, inter alia, participating in a robbery that 'in any way or degree obstructs, delays or affects commerce.' 18 U.S.C. § 1951(a). The scope of the Hobbs Act extends as far as Congress's power to regulate conduct under the Commerce Clause. See, Stirone v. United States, 361 U.S. 212, 215, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). The commerce element of the offense is met if the conduct in question creates 'a realistic probability of a ***de minimis*** **effect on interstate commerce**.'" United States v. Rodríguez-Casiano, 425 F.3d 12, 14 (1st Cir. 2005) (emphasis ours). See also, United States v. Vega-Molina, 407 F.3d 511, 527 (1st Cir. 2005).

> The Hobbs Act ... does not require proof that a defendant intended to affect commerce or that the effect on commerce was certain; it is enough that such an effect was the natural, probable consequence of the defendant's actions. Commerce is sufficiently affected under the Hobbs Act where a robbery depletes the assets of a business that is engaged in interstate commerce.

United States v. Williams, 342 F.3d 350, 354-355 (4th Cir. 2003) (internal quotations and citations omitted) (emphasis ours).

In United States v. Brennick, 405 F.3d 96, 100 (1st Cir. 2005), the defendant argued "that the evidence was insufficient to establish that the robbery affected interstate commerce ... because $522.37 taken from a store with gross sales for the month of $8.5 million was insufficient to cause the kind of effect on commerce necessary to trigger the

applicability of the Hobbs Act."

"The Concord Wal-Mart store manager testified at trial that if the stolen money had not been taken, it would have been reinvested in the purchase of goods manufactured outside the state of New Hampshire. That evidence sufficed to show the necessary effect on commerce." Id.

There was testimony that, at the time of the robbery, RFW consisted of a chain of four supermarkets and that RFW made local purchases good from local vendors, as well as direct purchases of goods from 10 to 15 vendors located in the mainland United States. It certainly stands to reason, using the analysis of "natural, probable consequence of the defendant's actions," Williams, supra, in interstate commerce that the amount of $60,000 stolen in the case at bar from RFW, a commercial establishment that regularly purchased goods across state lines, has considerable more impact in RFW's operations and in interstate commerce, than the $522.37 stolen from Wal-Mart's Concord, New Hampshire store.

As to defendant not possessing a firearm, circumstantial evidence reflects otherwise. According to forensic analyses, a total of three weapons were fired during the robbery. Two weapons were recovered: the security guard's and the dead assailant's.

Witnesses testified that two men exited the Intrepid to commit the robbery: one that was killed by the security guard while the other fit the general description of the defendant, who took the deposit bag from the manager, ran back to the Intrepid and got in on the passenger's side of the automobile. Two RFW employees who were at the crime scene saw the silhouette of a person shooting as the vehicle positioned itself behind the manager's car. They saw the person get out of the vehicle shooting, bend and pick up the deposit bag, and then get back in the Intrepid which then sped away. One of the employees

noticed that the person, who had blood on the face, was wearing blue jeans and a blue t-shirt with white stripes. It was reasonable to conclude that the blood indicated that the assailant had been wounded. Coincidentally, defendant was later found to have been in fact been shot and his blood matched the blood found on the Intrepid's right back passenger seat.[24]

The manager testified that, after the initial round of shooting ceased, he heard a person running towards him while voices farther away, coming from the Intrepid vehicle, repeated urged to "kill him." He then felt someone take the deposit bag from his hand while, keeping his eyes on the ground, he begged for mercy never seeing the person's face, only his white tennis shoes. He then heard two more shots and then saw the Intrepid speed away.

It stands to reason, and the jury was well within its province to infer, that defendant was the person who took the deposit bag. Also, it is reasonable to conclude that the voices the manager heard from the Intrepid urging him to "kill" or "shoot" him did so because the defendant was equipped to "kill" or "shoot" him with a weapon. The third weapon's presence was revealed to the forensics team by the spent shell casings, and was the object of eyewitness testimony (two assailants with weapons, plus the security guard with a weapon). Further, the evidence certainly allowed for the jury to conclude that the defendant had been wounded during the robbery and that only he could have stained the Intrepid's seat with his own blood, which was unequivocally identified by DNA-typing.

Lastly, we would be hard-pressed to find that the crime for which defendant was

---

[24] T,T, July 28, 2004, p. 96 ("back part of the car"); T.T. July 29, 2004, pp. 142 ("back seat, right-hand side, on the back part"), 146 ("back part, passenger side"); T.T. August 2, 2004, pp. 18 ("back seat"), 60 ("blood stains in the back seat").

convicted was one of opportunity; it required planning for its execution. Malice aforethought, therefore, was clearly an element which the jury considered to be proved beyond a reasonable doubt by the evidence presented at trial.[25]

For the foregoing reasons, we find sufficient evidentiary support in the record for the guilty verdicts on all three counts of conviction. There was sufficient evidence from which the jury could find, as it did, the defendant guilty as charged in the Superseding Indictment. There being sufficient evidence for the jury's inference of guilt, we see no valid reason to disturb its verdict, nor its underlying assessment as to the evidence and the credibility of the witnesses.

## - V -

## Conclusion

WHEREFORE, all premises considered, the defendant's "Motion for the Entry of an Order of Judgment of Acquittal Pursuant to Rule 29 and/or Motion to Compel Court Interview of Juror, and/or a New Trial Pursuant to Rule 33" (Docket No. 279) is DENIED.

In San Juan, Puerto, this 23rd day of December, 2005.

**s/ Daniel R. Domínguez**
**DANIEL R. DOMINGUEZ**
**U.S. DISTRICT JUDGE**

---

[25] There was ample evidence that the defendant and his cohorts acted with malice aforethought and premeditation: they used and carried weapons during the commission of the crime; they procured and used a stolen car as a getaway vehicle; they arrived at the scene at the precise moment that the manager and security guard were en route to make the deposit, indicative that they had taken the time to familiarize themselves with the bank deposit routine followed by the manager; they parked the car at the very end of RFW's parking lot, facing the exit for a rapid getaway; the assailants had planned the robbery to ensure success – two assailants for each of the two employees delivering the deposit to the bank, and one driver for the getaway car.